Case 2:20-cv-00536-AMM   Document 42-1   Filed 09/27/21   Page 1 of 6

Crosby v. Monroe County, 394 F.3d 1328 (11th Cir. 2004)

FILED
2021 Sep-27 AM 09:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

Page 1328

**394 F.3d 1328**
**William J. CROSBY, Plaintiff-Appellant,**
v.
**MONROE COUNTY, Jason Terry, Defendants-Appellees.**
**William J. Crosby, Plaintiff-Appellant,**
v.
**Jason Terry, Defendant-Appellee.**
**No. 03-13716.**
**No. 03-14310.**
**United States Court of Appeals, Eleventh Circuit.**
**December 28, 2004.**

Page 1329

COPYRIGHT MATERIAL OMITTED

Page 1330

William Maurice Pompey, Pompey & Pompey, P.C., Camden, AL, for Crosby.

Ashley Hawkins Freeman, Kendrick Emerson Webb, Bart Gregory Harmon, Webb & Eley, P.C., Montgomery, AL, for Defendants-Appellees.

Appeals from the United States District Court for the Southern District of Alabama.

Before ANDERSON, CARNES and RONEY, Circuit Judges.

CARNES, Circuit Judge:

Willie J. Crosby appeals the district court's grant of summary judgment in favor of former Monroe County Sheriff's Deputy Jason Terry based upon the court's decision that Terry was entitled to qualified immunity.

## I.

On November 11, 1999 at 8:48 p.m., Willie Scott called 911 to report that someone was trying to kill him.[1] Gunshots could be heard in the background. Jason Terry, then a Monroe County Sheriff's Deputy, listened to a recording of Scott's call and then responded immediately with other officers. When the officers arrived at Scott's home in Beatrice, Alabama, he told them that the shooter was in the woods near his home. The officers saw a person but were unable to apprehend him.

As the officers walked back to Scott's house after failing to apprehend the shooter, they heard another gunshot. The sound came from the direction of Willie J. Crosby's house, which is located across a wooded area from Scott's house. Upon investigating, the officers spotted Crosby carrying a shotgun. At the time the officers approached Crosby, he was returning the shotgun to his garage. (Crosby admits that earlier he had fired a "warning shot" at an individual he had spotted in his backyard.)

On his way to the garage, Crosby "racked" the shotgun, ejecting a spent shell. The officers heard this distinctive and threatening sound as they approached Crosby's home. The officers drew their weapons and ordered Crosby to "drop" the shotgun and lie face down on the ground. Crosby did not immediately comply but instead continued placing the shotgun inside the garage door. Crosby then lay on the ground as the officers had ordered him to do.

Two of the officers got on top of Crosby, putting their knees in his back, and began to handcuff him. Crosby raised his head and asked why he was being arrested. Deputy Terry then placed his foot on the side of Crosby's face and neck and applied pressure. In response, Crosby jerked one hand away from the officers who were attempting to handcuff him, shoved Terry's foot off his face, cursed at Terry, and asked Terry if he were crazy.

Crosby was then handcuffed and arrested. When the officers searched him, he was found to be carrying a .38 handgun. He was initially charged with reckless endangerment, and days later with resisting arrest. He was confined to jail on the reckless endangerment charge for approximately ten hours before being released.



At the time of his arrest, Crosby complained to Deputy Terry that he was handcuffed too tightly. At no time while he was in jail did Crosby display any symptoms indicating that he needed medical treatment, nor did he request medical attention. After being released on the morning of November 12, Crosby waited

Page 1331

several days before visiting a doctor. The doctor he eventually saw merely refilled a prescription that Crosby had previously received for back pain and gave him some other pain medication for arthritis. On or about January 5, 2000, Crosby was diagnosed with congestive heart failure.

Crosby was tried in the state district court for reckless endangerment and resisting arrest. He was found not guilty of reckless endangerment but guilty of resisting arrest. He appealed the conviction for resisting arrest to the Circuit Court of Monroe County where he received a jury trial, and he was again found guilty. The court then granted Crosby's motion for a new trial on the resisting arrest charge. (The grounds on which the motion was granted are not clear in the record.) As of the time of oral argument in this case, Crosby had not been retried.

## II.

Crosby filed a lawsuit in Alabama state court against Monroe County, various other Monroe County entities, and Deputy Terry. Terry was named both in his individual capacity and in his official capacity as a Monroe County sheriff's deputy. In addition to various state law claims, Crosby's complaint alleged unlawful arrest, use of excessive force, and denial of medical care while in custody, all asserted as 42 U.S.C. § 1983 claims.

The case was removed to federal court by the defendants. The district court dismissed: all claims against Monroe County and its various entities; all the state law claims against Deputy Terry; and all the federal law claims against Terry in his official capacity. That action left standing only the federal law claims against Terry in his individual capacity. When the district court dealt with those claims, it decided Terry was entitled to qualified immunity, and accordingly granted summary judgment in his favor on all of them. This is Crosby's appeal from the grant of summary judgment in favor of Terry on the three federal law claims against him in his individual capacity.[2]

## III.

This Court reviews *de novo* the district court's grant of summary judgment, applying

Page 1332

the same legal standards as did the district court. *Skrtich v. Thornton,* 280 F.3d 1295, 1299 (11th Cir.2002). Summary judgment is proper only when the evidence before the court establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Skrtich,* 280 F.3d at 1299. All evidence must be viewed in the light most favorable to the nonmoving party. *Skrtich,* 280 F.3d at 1299.

## IV.

A government official who is sued under § 1983 may seek summary judgment on the ground that he is entitled to qualified immunity. *Holloman ex rel. Holloman v. Harland,* 370 F.3d 1252, 1263 (11th Cir.2004). To be eligible for qualified immunity, the official must first establish that he was performing a "discretionary function" at the time the alleged violation of federal law occurred. *Id.* at 1263-64. Once the official has established that he was engaged in a discretionary function, the plaintiff bears the burden of demonstrating that the official is not entitled to qualified immunity. *Id.* at 1264. In order to demonstrate that the official is not entitled to qualified immunity, the plaintiff must show two things: (1) that the defendant has committed a constitutional violation and (2) that the constitutional right the defendant violated was "clearly established" at the time he did it. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151,



2156, 150 L.Ed.2d 272 (2001); *Holloman,* 370 F.3d at 1264.

### A.

To determine whether an official was engaged in a discretionary function, we consider whether the acts the official undertook "are of a type that fell within the employee's job responsibilities." *Holloman,* 370 F.3d at 1265. That is easy here. Because making an arrest is within the official responsibilities of a sheriff's deputy, Terry was performing a discretionary function when he arrested Crosby.

### B.

We turn now to the question of whether the doctrine of qualified immunity entitled Deputy Terry to summary judgment insofar as the three constitutional claims Crosby brought against him are concerned. Those three claims assert unlawful arrest, use of excessive force, and denial of medical care while in custody, and that is the order in which we will take up the claims.

As to the unlawful arrest claim, Crosby asserts that there was no probable cause for his arrest. The Fourth Amendment's guarantee against unreasonable searches and seizures encompasses the right to be free from arrest without probable cause. *See, e.g., Von Stein v. Brescher,* 904 F.2d 572, 579 (11th Cir.1990). Probable cause is "defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *Gerstein v. Pugh,* 420 U.S. 103, 111, 95 S.Ct. 854, 862, 43 L.Ed.2d 54 (1975) (internal marks and citations omitted).

The issue here, however, is not whether probable cause existed but instead whether there was arguable probable cause. Qualified immunity applies when there was arguable probable cause for an arrest even if actual probable cause did not exist. *Jones v. Cannon,* 174 F.3d 1271, 1283 n. 3 (11th Cir.1999) ("Arguable probable cause, not the higher standard of actual probable cause, governs the qualified immunity inquiry."). Arguable probable cause exists if, under all of the facts and circumstances, an officer reasonably could — not necessarily would — have believed that probable cause was present. *Durruthy v. Pastor,* 351 F.3d 1080, 1089

Page 1333

(11th Cir.2003) ("Arguable probable cause exists when an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed." (internal marks and citation omitted)); *Montoute v. Carr,* 114 F.3d 181, 184 (11th Cir.1997) ("In order to be entitled to qualified immunity from a Fourth Amendment claim, an officer need not have actual probable cause but only `arguable probable cause,' i.e., the facts and circumstances must be such that the officer reasonably could have believed that probable cause existed.").

Whether a particular set of facts gives rise to probable cause or arguable probable cause to justify an arrest for a particular crime depends, of course, on the elements of the crime. Under Alabama law, "A person commits the crime of reckless endangerment if he recklessly engages in conduct which creates a substantial risk of serious physical injury to another person." Ala.Code § 13A-6-24. That is one of the crimes for which Crosby was arrested.

It is undisputed that, in the events leading up to the arrest, Deputy Terry was responding to a report of gunshots fired toward the home of Crosby's neighbor, Scott, shortly before the officers arrived. The officers knew that Scott, who had been there when the shots were fired, was in fear for his life. While on the scene, they heard a shot from the direction of Crosby's home. As they approached that area, the officers saw Crosby carrying a shotgun and heard the sound of him ejecting a shell from the weapon. Given these facts, an officer in Terry's position reasonably could have believed that Crosby had fired multiple shots in the direction of his neighbor's house, including the shots they had heard while the neighbor was on the phone calling the sheriff's office for help, and that he had fired another shot



after they arrived. Because an officer in that position reasonably could have believed that Crosby had "create[d] a substantial risk of serious physical injury to another person," there was arguable probable cause to arrest Crosby for reckless endangerment as defined in Ala.Code § 13A-6-24.

Crosby argues that, even if there was probable cause, his arrest was still a violation of the Fourth Amendment. He points out that reckless endangerment is a misdemeanor, *see* Ala.Code § 13A-6-24(b), and Alabama law does not permit a warrantless arrest for a misdemeanor unless it occurred in the officer's presence, *see Telfare v. City of Huntsville,* 841 So.2d 1222, 1228-29 (Ala.2002). We rejected a materially identical contention in *Knight v. Jacobson,* 300 F.3d 1272, 1275-76 (11th Cir.2002), and that decision requires that we do the same here.

Crosby's second federal claim is that Deputy Terry used excessive force in arresting him. Although not happy about the way in which the officers held him down, Crosby's primary focus in making this claim is that at one point Terry put his foot on Crosby's face. Except for that fact, this would be an easy case.

The Fourth Amendment encompasses the right to be free from the use of excessive force during an arrest. *See Vinyard v. Wilson,* 311 F.3d 1340, 1347 (11th Cir.2002). As we have recently said, "[t]he `reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer's actions are `objectively reasonable' in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." *Kesinger ex rel. Estate of Kesinger v. Herrington,* 381 F.3d 1243, 1248 (11th Cir.2004).

In making an excessive force inquiry, we are not to view the matter as judges from the comfort and safety of our

Page 1334

chambers, fearful of nothing more threatening than the occasional paper cut as we read a cold record accounting of what turned out to be the facts. We must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal. *See Graham v. Connor,* 490 U.S. 386, 396-97, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989); *Kesinger,* 381 F.3d at 1248-50; *Garrett v. Athens-Clarke County,* 378 F.3d 1274, 1279 (11th Cir.2004).

From that perspective, a reasonable officer could have believed that the force applied was reasonably necessary in the situation Deputy Terry found himself in that night. The circumstances were fraught with danger for the officers. Multiple shots had been fired, Crosby's neighbor was in fear for his life, and after the officers arrived on the scene a shot was fired from the direction of Crosby's house. As they approached, the officers saw Crosby carrying a shotgun and heard the sound of him ejecting a shell from the weapon. As Crosby himself described that "racking" sound in his deposition: "It makes a heart-wrenching sound if you're on the wrong side of the fence." Around this time, the officers began running and yelling, "He's got a shotgun!" Then one or more of the officers, with pistol drawn, ordered Crosby to drop the shotgun, but he did not do so. Instead, he continued placing the shotgun in the garage.

Thereafter Crosby did lie face down on the pavement, as the officers had ordered, but he was not docile. While the officers were trying to hold him down and handcuff him, Crosby raised his head and asked why he was being arrested. It was then that Deputy Terry put his foot on Crosby's face and pushed his head back down. In response, Crosby jerked his hand away from the handcuffing attempt, shoved Terry's foot off, cursed at Terry, and asked him if he were crazy. Terry did not put his foot back on Crosby's face or otherwise respond to the cursing. Eventually, the officers got Crosby handcuffed. At no time did Terry or any other officer kick or punch Crosby.



Crosby did not cry out in pain. Other than being indignant about having a foot on his face, Crosby did not say then — and so far as the record reveals he has not testified since — that it was painful.

The Supreme Court "has long recognized that the right to make an arrest ... necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham,* 490 U.S. at 397, 109 S.Ct. at 1872-73; *accord Garrett,* 378 F.3d 1274 (hit with baton, tackled, pepper-sprayed, and tied up); *Draper v. Reynolds,* 369 F.3d 1270 (11th Cir.2004) (taser gun); *Durruthy,* 351 F.3d 1080 (knee in back). Furthermore, the purpose of the qualified immunity doctrine is to give meaning to the proposition that "[g]overnment officials are not required to err on the side of caution" when it comes to avoiding constitutional violations. *Marsh v. Butler County,* 268 F.3d 1014, 1030 n. 8 (11th Cir.2001) (en banc).

Though Crosby was on the ground at the time Deputy Terry put his foot on Crosby's face, he had not yet been handcuffed. For all the officers knew, Crosby had other weapons concealed on his person — as it turned out, he actually did have another weapon on him — and raising his head to ask why he was being arrested could have been an attempt by Crosby to distract Terry and a prelude to actual resistance. Given the circumstances and the risks inherent in apprehending any suspect, an officer in Terry's position reasonably could have concluded that it was imperative to keep Crosby, who had not been

Page 1335

entirely cooperative, completely flat and immobile until he had been successfully handcuffed. The fact that Crosby was able to wrestle his hand loose and push Terry's foot away indicates that he had not been subdued.

There is also the fact that the force about which Crosby complains, while undignified in its placement, was not severe in amount. *See Durruthy,* 351 F.3d at 1094 (stating that "`the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment'" (quoting *Nolin v. Isbell,* 207 F.3d 1253, 1257 (11th Cir.2000))); *Lee v. Ferraro,* 284 F.3d 1188, 1198 (11th Cir.2002) (noting that one factor to be considered in evaluating excessive force claims is "the relationship between the need and amount of force used" (internal citation omitted)). Before us there is no evidence — as distinguished from bare allegations — that Deputy Terry's foot on Crosby's face caused him any physical injury. Crosby did say in his affidavit that being handcuffed hurt, and he testified in his deposition that he thinks having the two officers on his back — Terry was not one of them — aggravated his preexisting back condition. However, he did not say in any affidavit or deposition testimony in the record before us that the foot on his face was physically painful.

Crosby's final claim is that Deputy Terry denied him medical care while he was incarcerated. An officer violates a detainee's "Fourteenth Amendment right to due process if he acts with deliberate indifference to the serious medical needs of the detainee." *Lancaster v. Monroe County,* 116 F.3d 1419, 1425 (11th Cir.1997). An officer acts with "deliberate indifference" when he knows that a detainee is in "serious need of medical care" and does not obtain medical care for that detainee. *Id.*

Crosby has presented no evidence that he was in need of medical care, much less evidence that Deputy Terry was aware of his need and refused to obtain care for him. In his deposition, Crosby admits that he did not request medical care while in jail. In fact, he did not seek medical treatment until several days after his release. He says that he went to see a doctor "whenever [he] could get around to it." Crosby's behavior upon being released is inconsistent with his argument that, while in jail, he had such serious medical needs that it should have been obvious to Terry. Besides, Crosby has not even presented any evidence that Terry observed him while he was incarcerated.

C.



The district court's grant of summary judgment to Deputy Terry on grounds of qualified immunity is AFFIRMED.

---------------

Notes:

1. Because we are required to view the facts in the light most favorable to the nonmoving party, *Skrtich v. Thornton,* 280 F.3d 1295, 1299 (11th Cir.2002), we recite the facts in the light most favorable to Crosby.

2. Crosby also appealed the district court's order that he pay Deputy Terry's attorney's fees and costs, pursuant to 42 U.S.C. § 1988. After filing his appeal with this Court, Crosby filed for bankruptcy. The parties then agreed that the portion of the appeal dealing with attorney's fees and costs was moot because Crosby has no assets with which to satisfy an award.

Crosby's bankruptcy filing does not prevent us from adjudicating the merits of this appeal. The automatic stay provision of the Bankruptcy Code, 11 U.S.C. § 362, does not extend to lawsuits initiated by the debtor. *See* 11 U.S.C. § 362; *Martin-Trigona v. Champion Fed. Sav. & Loan Ass'n,* 892 F.2d 575, 577 (7th Cir.1989) (the automatic stay is inapplicable to suits by the debtor); *Carley Capital Group v. Fireman's Fund Ins. Co.,* 889 F.2d 1126, 1127 (D.C.Cir.1989) (same); *see also Victor Foods, Inc. v. Crossroads Econ. Dev. of St. Charles County, Inc.,* 977 F.2d 1224, 1227 (8th Cir.1992); *Trans Caribbean Lines, Inc. v. Tracor Marine, Inc.,* 49 B.R. 360, 362 (S.D.Fla.1985) (stating that the automatic stay provision only applies to proceedings against the debtor).

Additionally, because Crosby filed under Chapter 13 of the Bankruptcy Code, he retains standing to pursue legal claims on behalf of the estate. *See* 11 U.S.C. § 1303; Fed. R. Bankr.P. 6009; *In re Mosley,* 260 B.R. 590, 595 (Bankr.S.D.Ga.2000) ("In Chapter 13 cases where the debtor is the party plaintiff, courts recognize that the Chapter 13 debtor may sue and be sued, and that the debtor controls the litigation as well as the terms of the settlement."); *see also Cable v. Ivy Tech State Coll.,* 200 F.3d 467, 474 (7th Cir.1999); *Olick v. Parker & Parsley Petroleum Co.,* 145 F.3d 513, 515 (2d Cir.1998); *Mar. Elec. Co. v. United Jersey Bank,* 959 F.2d 1194, 1210 n. 2 (3d Cir.1991).

---------------

